IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LINDA F. CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 13-00034-N |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Plaintiff Linda F. Carter filed this action seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") that she was not entitled to disability insurance benefits ("DIB") under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-433, or to Supplemental Security Income benefits (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381-1383c. Pursuant to the consent of the parties (doc. 18), this action has been referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. *See* Doc. 20. The plaintiff's unopposed motion to waive oral arguments (doc. 19) was granted on July 18, 2013 (doc. 21). Upon consideration of the administrative record (doc. 13), and the parties' respective briefs (docs. 14 and 16), the undersigned finds that the decision of the Commissioner is due to be **AFFIRMED.**

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is to be substituted for Michael J. Astrue as the defendant in this suit. *See*, 42 U.S.C. § 405(g).

I. Procedural History.

Plaintiff Linda F. Carter ("Carter") filed a Title II application for disability insurance benefits (DIB) and a Title XVI application for Supplemental Security Income benefits (SSI) on March 18, 2010. (Tr. 89, 90). Carter claimed an onset of disability as of May 7, 2008. (Tr. 132, 139). She alleged an inability to work based upon the following impairments: diabetes, and numbness in the left leg and foot. (Tr. 157). She was fifty-three years old at the time she filed her application (Tr. 89, 90). The applications were denied on June 11, 2010 (Tr. 89, 90). On July 8, 2010, Carter requested a hearing (Tr. 40, 108) before an Administrative Law Judge ("ALJ").

Following a hearing on November 30, 2011 (Tr. 54-88), the ALJ issued an unfavorable decision on December 9, 2011 (Tr. 37-53). Although the ALJ found that plaintiff suffers from the severe impairments of degenerative changes of the cervical spine, lumbar facet arthropathy, polyneuropathy, lumbar stenosis, and insulin dependent diabetes mellitus (Tr. 42), she determined that plaintiff retains the residual functional capacity ("RFC") to perform light work except: she can never climb ladders, ropes or scaffolds; can rarely climb ramps or stairs; never crouch, kneel or crawl; will require use of a handheld assistive device for walking on uneven terrain or slippery surfaces; never work at unprotected heights or around vibrations; and must alternate between sitting and standing on an occasional basis (Tr. 43). The ALJ presented this RFC to the vocational expert who then testified that a significant number of jobs existed for an individual with such an RFC. (Tr. 48, 82-86). Based upon the vocational expert's testimony, the ALJ declared that plaintiff was not disabled. (Tr. 48).

Carter requested a review by the Appeals Council (Tr. 34-36) that was subsequently denied on December 10, 2011 (Tr. 1-3); thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981 (2009).[2] Carter has exhausted all her administrative remedies and now appeals from that final decision.

II. Issue on Appeal.[3]

> Whether the ALJ committed reversible error with respect to Carter's RFC assessment because the record is devoid of any RFC assessment from any physician?

III. Standard of Review.

A. Scope of Judicial Review.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one. Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen,

[2] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition of part 404, which addresses claims under Title II of the Act. All cited regulations have parallel citations in part 416, which address claims under Title XVI of the Act.

[3] The Commissioner has suggested a corollary issue, namely "Whether the ALJ erred in not requesting an additional consultative examination with a formal RFC assessment or, in the alternative, recontacting treating or examining medical sources to determine Carter's abilities and limitations." (Doc. 16 at 1-2). There is no purpose in setting forth this corollary issue because the case may be resolved by simply addressing plaintiff's issue.

792 F.2d 1065, 1067 (11th Cir. 1986). Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400; Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991). *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

B. Statutory and Regulatory Framework.

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate

and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010). The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[4]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.* It also can contain both exertional and nonexertional limitations. *Id*. at

[4] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 Subpt. P, app. 2 ("grids"), or hear testimony from a vocational expert (VE). *Id*. at 1239–40.

IV. Relevant Facts.

A. Carter's vocational background.

Carter was born on October 25, 1957. (Tr. 89, 90). She was 54 years old on December 9, 2011, when the ALJ issued her unfavorable decision (Tr. 49, 58). She completed high school and one year of college (Tr. 58). In the relevant past, Carter worked as a cleaner (housekeeping), convenience store sales clerk, and a sewing machine operator (Tr. 77-78, 159). Her last employment was May 2008 (Tr. 59, 132, 215).

B. Medical Evidence.

Carter's primary treating physician for her diabetes and back pain since at least January 2009 has been Elizabeth O. Bataglia, M.D. (Tr. 223-225,234-253). Carter presented to Dr. Bataglia on January 12, 2009, complaining of problems with her left foot and it was noted that she was in poor compliance with her treatment regimen (Tr. 199). Dr. Bataglia noted on February 23, 2009, that she again discussed diet and compliance with Carter (Tr. 198). At the April 6, 2009 "check-up" examination, Dr. Bataglia noted that Carter "has done very well with her diabetes but needed to adjust [her] diet" and that her back was "doing very well" (Tr. 198). Dr. Bataglia reported that Carter's extremities

were within normal limits (Tr. 198). Carter was told to return for reassessment in three months (Tr. 198).

Carter presented to Dr. Bataglia on April 10, 2009, to discuss recent MRI results (Tr. 197). Dr. Bataglia reported that Carter's "lower leg paresthesia"[5] did not appear to result from "any focal spinal foraminal stenosis or any disc herniation" but is "mostly mild facet arthropathy"[6] (Tr. 197). Dr. Bataglia further reported that Carter was "doing extremely well" with an increased prescription medication dosage (Tr. 197).

Carter subsequently saw Dr. Bataglia on an occasional basis (approximately every three to six months) from July 2009 to April 2010, with some increase in frequency between April 2010 through January 2011 (Tr. 195-196, 223-225). Carter's follow-up visits with Dr. Bataglia were primarily for the purposes of medication adjustments for her back and foot pain, discussions regarding her diet, treatment of vaginal infections, or for her yearly check-up. At the January 15, 2010 appointment, Dr. Bataglia reported that Carter's physical examination was unremarkable but her blood sugar was elevated, which required Dr. Bataglia to "discuss[] diet [and] nutrition at length" (Tr. 196).

In June 7, 2010, Stephen M. West, M.D., performed a consultative examination on Carter at the request of the state agency (Tr. 214-216). Carter complained to Dr. West of

[5] "Paresthesia" is a condition in which you feel a sensation of burning, numbness, tingling, itching or prickling, which can also be described as "a pins-and-needles or skin-crawling sensation" most often occuring in the extremities. http://www.localhealth.com/article/paresthesia.

[6] "Facet arthropathy" is degenerative arthritis affecting the facet joints in the spine. http://arthritis.about.com/od/spine/p/facet_joints.htm.

"severe back pain and pain that goes down into the left leg" (Tr. 214). Dr. West reported that Carter "has numbness and tingling of the left leg but no weakness in the leg" (Tr. 214). Carter told Dr. West that "a lot of this is due to her diabetes" (Tr. 214). Dr. West's physical examination of Carter revealed:

> Neurologically: Cranial nerves 2-12 are grossly intact. No obvious focal, motor or sensory deficit. Musculoskeletal: Grip strength bilateral 5/5. Flexion and extension of both wrists 5/5. Flexion and extension of both elbows 5/5. Flexion, extension, abduction and dorsiflexion of both shoulders 5/5. Plantar flexion and dorsiflexion bilaterally 5/5. Flexion and extension of both knees 5/5. Flexion, extension, abduction and adduction of both hips 5/5. Straight leg raises were negative. The patient could bend over to ankle level. She could do a squat by holding onto the chair. She would not attempt to do heel-toe maneuvers [but] walked with a normal gait. Examination of all her other joints revealed full range of motion and no contractures. . . . Extremities: Without edema.

(Tr. 215).

On May 4, 2011, Carter presented to Dr. Bataglia to "go over papers" in relation to her application for disability. However, Dr. Bataglia reported that Carter had not been compliant with her treatment and she opined that she did "not see how [Carter] can get disability if she has not really tried to improve her sugar at all with diet and exercise" (Tr. 264). Dr. Bataglia also noted that she told Carter not only that she "really needs to try to help me in order for her to do better [and that] the disability is not going to be worth anything when she is on dialysis" (Tr. 264). Dr. Bataglia has not imposed any functional limitations upon Carter and her specific reference in the May 4, 2011 treatment note to Carter's lack of compliance with "diet and exercise" (Tr. 264) confirms that there were no physical limitations.

Carter was seen by Craig A. Peterson, M.D., in the late summer and fall of 2011, on referral from Dr. Bataglia for an abnormal mammogram (Tr. 268-270, 274, 282). At Carter's August 4, 2011 appointment, Dr. Peterson reported that she denied muscle cramps, muscle weakness, arthritis, and back, neck, and joint pain (Tr. 269). Dr. Peterson performed a biopsy in September 2011 and assessed Plaintiff with microcalcifications of the right breast (Tr. 274).

C. Carter's Testimony.

Carter testified at the November 30, 2011 hearing that she was the primary caretaker for three teenage granddaughters that lived with her (Tr. 58, 64). She said that she assisted them with cooking and cleaning, as well as helping with their homework (Tr. 65). Carter complained of numbness in her left hand but acknowledged that she was right handed (Tr. 63). She testified that she could walk indefinitely with a cane (not prescribed) but could only sit for 15 minutes at a time and stand for 30 minutes at a time (Tr. 67-69, 78).

Carter testified she attends about three or four of her grandaughter's basketball games during the season (Tr. 65). She also testified that she attends church twice a month and sings in the church choir, for which requires she attends choir practice once a month (Tr. 65-66). She does her grocery shopping with either her daughter, who lives next door to her, or with one of her grandchildren, and is able to walk around the store but her daughter or grandchild "get the things that I need to put in the buggy" (Tr. 66-67). She testified that she assists her grandchildren in the cooking and cleaning (Tr. 65). When asked to identify what she has trouble doing, Carter replied: "Mostly, cleaning the

bathroom . . . because it's a lot of bending over [and] getting down on your knees [from which she] has trouble getting up" (Tr. 69-70). She further testified that, she "can basically move around in the house pretty well once I get the medicine in me" (Tr. 71). She testified that she does not drive very much and cannot drive long distances (Tr. 71). She also testified that, in a week, she has about four good days and three bad days (Tr. 72). She described the bad days as waking up with a very bad headache for which she would take her blood pressure medicine to "ease my headache down" and then check her blood sugar and stay in bed until "about 11 o'clock" when she would get up and make breakfast (Tr. 72-73). She would then "sit around or . . . walk to [her] daughter's house, which is next door[, and] sit and talk with her a few minutes" (Tr. 73-74). On those bad days, if she doesn't feel like doing anything, she doesn't do anything (Tr. 74).

D. Vocational Expert's Testimony.

The ALJ asked Vicky Pratton, a vocational expert, to assume a hypothetical individual of Carter's age, education, and work experience who retains the residual functional capacity ("RFC") to perform light work except: she can never climb ladders, ropes or scaffolds; can rarely climb ramps or stairs; never crouch, kneel or crawl; will require use of a handheld assistive device for walking on uneven terrain or slippery surfaces; never work at unprotected heights or around vibrations; and must alternate between sitting and standing on an occasional basis (Tr. 43). Pratton testified that such

an individual could not perform Carter's past relevant work but could perform the representative light and sedentary exertion jobs as a toll collector,[7] routing clerk,[8] ticket seller,[9] and telephone solicitor[10] (Tr. 82-86). Patton testified that these jobs could be performed sitting or standing (Tr. 84).

E. ALJ's Decision.

The ALJ considered all the evidence of record and found that Carter's degenerative changes of the cervical spine, lumbar facet arthropathy, polyneuropathy, lumbar stenosis, and insulin dependent diabetes mellitus were "severe" impairments (Tr. 42; Finding No. 3). The ALJ also found, however, that her impairments did not meet or medically equal any of the listed impairments in 20 C.F.R., pt. 404, subpt. P. app. 1 (Tr. 42; Finding No. 4). The ALJ evaluated Carter's back impairment under Listing 1.04 and found that, because she does not have nerve root compression with sensory reflex loss or a positive straight-leg raising test result, evidence of spinal arachnoiditis, and effectively ambulates, her impairment does not meet the requirements of this listing (Tr. 43). The ALJ further found that, "[w]ith regard to diabetic peripheral or sensory neuropathy, the

[7] Patton testified that a toll collector (DOT code 211.462-038) is light duty with the SVP of 2 and exist 3,439,380 such jobs in the national economy and 66,620 such jobs in Alabama. (Tr. 83).

[8] Patton testified that a routing clerk (DOT code 222.587-038) is light duty with the SVP of 2 and exist 447,623 such jobs in the national economy and 5,395 such jobs in Alabama. (Tr. 83).

[9] Patton testified that a ticket seller (DOT code 211.467-030) is light duty with the SVP of 2 and exist 78,590 such jobs in the national economy and 1,522 such jobs in Alabama. (Tr. 83).

[10] Patton testified that the telephone solicitor (DOT code 299.357-014) is sedentary work with the SVP 3, and there exist 301,391 such jobs in the national economy and 4,789 jobs in Alabama. (Tr. 81).

claimant does not meet the requirements of Listing 11.4 because there is no evidence of disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (Tr. 43). The ALJ also found that Carter "has no evidence of cardiac arrhythmias, intestinal necrosis, cerebral edema or seizures, diabetic ketoacidosis, or mood/eating disorders[,] diabetic peripheral vascular disease, diabetic retinopathy, coronary artery disease, [] diabetic gastroparesis, diabetic nephropathy, skin infections, or mental impairments resulting from diabetes mellitis" (Tr. 43).

The ALJ found, based not only on Carter's testimony concerning her general activities of daily living but on the treatment notes of her physicians, that she retained the residual functional capacity to perform work at the light level of exertion with additional postural and environmental limitations consisting of no climbing ladders, ropes or scaffolds; no crouching, kneeling, or crawling; no work at unprotected heights or around vibrations; rarely climbing ramps or stairs; the use of a handheld assistive device for walking on uneven terrain or slippery surfaces; and the ability to alternate between sitting and standing on an occasional basis (Tr. 43; Finding No. 5). Because, according to the vocational expert, this residual functional capacity did not preclude Plaintiff from performing light exertion jobs as a toll collector, routing clerk, and ticket seller, as well as the sedentary job of telephone solicitor (Tr. 48), the ALJ determined that Carter was not disabled under the Act (Tr. 48; Finding No. 11).

V. Analysis.

**The ALJ's residual functional capacity assessment is supported by substantial evidence**.

Carter argues, in sum, that "there is no support for the ALJ's RFC assessment as the record is devoid of any RFC assessment from any physician." (Doc. 14 at 3). Carter also contends that "the ALJ's RFC findings are not supported by substantial evidence because they are not based upon the formal opinion of any physician [and] no physician ever offered any specific opinion as to what Ms. Carter was physically capable of despite her impairments." (*Id*. at 4). Carter relies principally on Coleman v. Barnhart, 264 F.Supp.2d 1007, 1010 (S.D. Ala. 2003)("[T]he [ALJ's] residual functional capacity assessment . . . must be supported by the residual functional capacity assessment of a treating or examining physician.").

The Commissioner argues, in sum, that a determination regarding residual functioning capacity is an assessment to be made solely by the ALJ, although it must be based upon all of the relevant evidence concerning a claimant's ability to work despite his impairments. (Doc. 16 at 9); *see also* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004)(*quoting* 20 C.F.R. § 404.1520(e) (the ALJ will "assess and make a finding about the [claimant's] residual functional capacity based on all the relevant medical and other evidence"). The Commissioner specifically contends that

> The agency's regulations and rulings make clear that it is the ALJ's responsibility, not the responsibility of a physician, to assess a claimant's residual functional capacity. *See* 20 C.F.R. § 416.946(b) (at the hearing level of the administrative process, the ALJ is responsible for assessing a claimant's residual functional capacity); SSR 96-5p, 1996 WL 374183, at *2 (same). The determination of a claimant's residual functional capacity

> may often be "dispositive" of the claimant's disability status. *See* 20 C.F.R. § 416.927(e)(2); SSR 96-8p, 1996 WL 374183, at *2. For that reason, residual functional capacity assessments "must be based on all relevant evidence in the record," not just the medical evidence. *See* SSR 96-5p, 1996 WL 374184, at *5 (emphasis added); 20 C.F.R. § 416.945(a). As such, no doctor's opinion or testimony is alone conclusive on this issue. SSR 96-2p, 1996 WL 374183, at *2 ("some issues [such as residual functional capacity assessments] are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case" and "the regulations provide that the final responsibility for deciding issues such as these are reserved to the Commissioner").

(Doc. 16 at 8-9).

Carter's narrow interpretation of Coleman is unavailing. The Court's inability to ascertain how the ALJ determined that Coleman could perform the physical requirements of medium work must be examined in the proper perspective of not only "[Coleman's] numerous severe impairments,"[11] but in light of the fact that "the consultative cardiologist the Social Security Administration ["SSA"] sent plaintiff to, Dr. Benjamin Citrin, specifically recommended a stress test to assess functional capacity [and] did not complete the PCE sent to him by SSA because he felt a stress test needed to be conducted to assess functional capacity." Coleman, 264 F.Supp.2d at 1010-11 (internal record citation omitted). There was, therefore, evidence in the record that demonstrated a need for further development of the record in Coleman.

[11] These impairments included "Graves' disease with Graves' ophthalmopathy, obesity, post-surgical hypothyroidism, pretibial myxedema, diabetes mellitus, gastroesophageal reflux disease, borderline intellectual functioning, atrial fibrillation, and cardiomyopathy." Coleman, 264 F.Supp.2d at 1008.

Carter also contends that this Court, in Huddleston v. Astrue, 2008 WL 2225697, *4 (S.D. Ala. May 29, 2008), "reiterated its previous holding in Coleman that the Commissioner's fifth-step burden cannot be met by the residual functional capacity assessment of a non-examining, reviewing physician." (Doc. 14 at 5). However, the Court's conclusion in Huddleston that "there is simply no basis upon which this Court can find that the ALJ's sedentary work determination is supported by substantial evidence" was predicated on the fact that the ALJ's assessment that the plaintiff could perform sedentary work, which "assumes the ability to sit, stand and walk for 8 hours in an 8-hour workday," was inconsistent with the treating physician's assessment which "limit[ed] plaintiff to sitting a total of 2 hours in an 8-hour workday and standing and/or walking a total of 2 hours in an 8-hour workday (*i.e.*, the ability to sit, stand, and walk a total of 4 hours in an 8-hour workday)." 2008 WL 2225697 at *4. Consequently, Huddleston is also distinguishable from the present case.

In contrast to Carter's interpretation of Coleman and Huddleston as mandating a residual functional capacity assessment by a treating or examining physician in every case, the Eleventh Circuit has recently upheld an ALJ's RFC assessment notwithstanding the absence of any assessment performed by an examining or treating physician. Packer v. Commissioner, Social Security Admin., 2013 WL 5788574 (11th Cir. Oct. 29, 2013). The Eleventh Circuit held that:

> In this case, Packer has failed to establish that her RFC assessment was not supported by substantial evidence. . . . As for the medical evidence, Packer provided little evidence that supported her allegations that her alleged impairments had limited her physical functioning or work-related activities—the medical sources indicated that Packer's physical functioning

> in the pertinent areas was normal or only mildly restricted, and none of the medical sources indicated that Packer had any significant functional limitations, let alone any disability. Notably, during the 18–month relevant time period, Packer did not seek any medical treatment for almost an entire year between February 2009 and January 2010. Moreover, Packer's X-rays were normal, she regularly demonstrated full range of motion in her legs and lower back, and Packer never received more than arguably conservative measures to treat any of her conditions. Therefore, Packer failed to establish that the ALJ's RFC assessment is not supported by substantial evidence.

2013 WL 5788574 at *2. *See also*, Rogers v. Colvin, 2013 WL 5422793, *10 (S.D. Ala., September 26, 2013)(Rejected "Plaintiff's contention that the ALJ's RFC assessment was not based on substantial evidence simply because the record is devoid of an RFC assessment by a treating or examining physician."), *citing* Green v. Soc. Sec. Admin., 223 Fed. App'x 915, 923 (11th Cir. 2007)(Affirmed the district court's finding that the ALJ's RFC assessment was supported by substantial evidence where the ALJ properly rejected the treating physician's opinion and formulated the plaintiff's RFC based on treatment records, without a physical capacities evaluation by any physician.); Packer v. Astrue, 2013 WL 593497, *2 (S.D. Ala. February 14, 2013)(the fact that no treating or examining medical source submitted a physical capacities evaluation "does not, in and of itself, mean that there is no medical evidence, much less no 'substantial evidence,' to support the ALJ's decision."), *aff'd sub nom* Packer v. Commissioner, Social Security Admin., 2013 WL 5788574 (11th Cir. Oct. 29, 2013). The Court in McLeod v. Colvin, 2013 WL 5935210 (M.D. Ala., November 05, 2013), similarly held:

> In Packer v. Astrue, 2013 WL 593497 (S.D. Ala. Feb. 14, 2013), Chief Judge Granade rejected the absolutism of requiring a RFC assessment by a treating physician, noting that "numerous court had upheld ALJ's RFC determinations notwithstanding the absence of an assessment performed by

> an examining or treating physician." *Id*. at *3. Like those other courts, this court rejects the seemingly mandatory requirement that the Commissioner's fifth-step burden must be supported by an RFC assessment of a physician. The ALJ had before her sufficient medical evidence from which she could make a reasoned determination of McLeod's residual functional capacity. Thus, she was not required to secure from a medical source a residual functional capacity assessment.

McLeod, 2013 WL 5788574 at *7. *See also* Warbington v. Colvin, 2013 WL 6627015, *11 (S.D. Ala., December 17, 2013)("[A]s long as an ALJ's RFC determination is supported by—and linked to—substantial and tangible evidence regarding her current ability to perform the physical, mental, sensory, and other requirements of work, there need not be an RFC determination from a physician.").

In this case, Carter has failed to establish that the ALJ's RFC assessment was not supported by substantial evidence. In contrast, the RFC assessment is supported by the following evidence of record:

- Carter's earliest treatment notes by Dr. Bataglia in April 2009 indicated that she was "doing very well with her diabetes" (Tr. 198) and "doing extremely well" with her back pain (Tr. 197).

- An MRI of the lumbar spine taken on April 8, 2009, showed only mild lumbar facet arthropathy and was otherwise unremarkable, "with no significant focal, spinal or foraminal stenosis identified." (Tr. 211).

- Nerve conduction studies indicated some evidence of polyneuropathy but ruled out sciatic neuropathy and lumbosacral radiculopathy on August 3, 2009 (Tr. 191-193).

- In addition to having no medical evidence prior to April 2009, Carter's subsequent treatment notes showed "only limited, infrequent treatment" until after 2010 (Tr. 195-212).

- Although Carter's office visits increased in frequency in 2010, her blood sugar was treated solely with adjustments to her medications and her

extremities were consistently determined to be "within normal limits" (Tr. 225, 263, 266).

- In her only emergency room visit in January 2011, Carter did show evidence of muscle spasm and decreased range of motion but her x-ray of the cervical spine showed no acute abnormality (Tr. 234-238). Her condition was treated with Flexaril and she was advised to apply heat for the pain (Tr. 234-238).

- Dr. West's examination on June 7, 2010, revealed that Carter denied any weakness in her legs, denied pain in her feet and toes despite the numbness, had no obvious focal, motor or sensory deficit, had normsl range of motion and negative straight leg raises, could bend to ankle level and perform a squat if holding on to a chair, and had normal gait and no evidence of edema (Tr. 214-216).

- Carter's past non-compliance with her diabetes treatment orders is well documented, including her admission in March 2011 that she "doesn't take her Lantus . . . on a regular basis, just her Metformin 1000 once/day" (Tr. 266), and Dr. Bataglia's specific notes regarding non-compliance (Tr. 196, 264).

- The improvement in Carter's diabetes is evidenced by the improvement in her A1C test results (*cf*., results of 11.0 on January 15, 2010 (Tr. 210) and 8.5 on September 28, 2011, which is reported to be almost at the "controlled diabetic" level (Tr. 255).

The ALJ not only referred to, and relied upon, this medical evidence when making his determination regarding Carter's RFC, but considered her own testimony regarding her activities of daily living, including her testimony that she was the primary caretaker for three teenage granddaughters that lived with her (Tr. 58, 64), she assisted them with cooking and cleaning, is able to walk around the grocery store while shopping with her daughter, attends church twice a month, sings in the choir and attends choir practice once a month, she could walk without limitation if she used her cane to balance herself (Tr. 67), and could stand thirty minutes at a time without problem (Tr. 68) but that she had to

walk around if she sat for more than fifteen minutes (Tr. 68). The sit/stand requirement in the RFC was to accommodate Carter's alleged limitation in this area (Tr. 46).

The ALJ described his RFC assessment for Carter as being:

> [S]upported by the limited treatment sought by the claimant, the mild and normal findings regarding clinical signs or diagnostic testing throughout the evidence, the limited nature of the claimant's reported symptoms during treatment, the effectiveness of the claimant's prescribed medications, the substantial activities of daily living inconsistent with the claimant's allegations and the opinion evidence in Exhibit 7F [Office Treatment Records, dated 01/24/2011 to 09/29/2011, from Flomaton Medical Center (Tr. 254-266)].

(Tr. 47). Carter does not challenge either the evidence relied on by the ALJ or the ALJ's interpretation of this evidence. Rather, Carter argues only that the ALJ was nonetheless required to obtain a specific RFC assessment by a treating or examining physician. As set forth herein, the law does not require such an additional assessment absent a finding that the evidence of record does not support the ALJ's assessment. Carter has failed to establish that the evidence of record is lacking in any aspect or otherwise fails to support the ALJ's RFC assessment. Consequently, the requisite substantial evidence supports the ALJ's RFC assessment and the ALJ's decision is due to be affirmed.

CONCLUSION.

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that the decision of the Commissioner denying plaintiff's application for DIB and SSI benefits is supported by substantial evidence and is due to be and is hereby **AFFIRMED**.

**DONE** this 23rd day of January, 2014.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**